**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LISA JAROLIN-BOGERT,

      Plaintiff,

    v.

OFFICE OF THE CHIEF JUDGE OF THE
CIRCUIT COURT OF COOK COUNTY and
COOK COUNTY, as indemnitor,

      Defendants.

No. 21 CV 552

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lisa Jarolin-Bogert worked for the Circuit Court of Cook County for over twenty years as a Court Liaison within the Social Services Department. She believed that she was treated differently than her male colleagues, particularly in terms of how and when she was granted vacation requests. Jarolin-Bogert complained to her supervisor and filed two charges with the EEOC alleging discrimination and retaliation. Jarolin-Bogert returned from an extended leave of absence to find that her job duties had been reassigned and retired in protest. She brings this case alleging discrimination on the basis of sex and retaliation. Defendant moves for summary judgment. Jarolin-Bogert does not have evidence that she was the subject of an adverse employment action or that her workplace was a hostile environment. Nor can she show that her complaints or EEOC charges were the cause

of her employer's allegedly negative treatment of her. Summary judgment is entered for defendants on all claims.[1]

## I. Legal Standards

A motion for summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party … [and] [t]he substantive law of the dispute determines which facts are material." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (internal citations omitted). A court does not make credibility determinations when deciding a motion for summary judgment. *Id*. at 741–42. Instead, the court views "the facts and draw[s] reasonable inferences in the light most favorable to the non-moving party" to make its determination as to whether judgment is appropriate. *Sullivan v. Flora*, 63 F.4th 1130, 1141 (7th Cir. 2023).

## II. Local Rule 56.1 and Evidentiary Issues

Parties submit evidence at summary judgment through Local Rule 56.1 statements of fact. N.D. Ill. Local R. 56.1(a)(2). The evidence contained in those statements must be admissible at trial, except that affidavits or depositions may be accepted in lieu of live testimony. *See* Fed. R. Civ. P. 56(c) *and Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Testimony presented through affidavits or

---

[1] The Office of the Chief Judge of the Circuit Court of Cook County employed Jarolin-Bogert. Cook County is a named defendant solely for purposes of indemnification. References to "defendant" refer to the Office of the Chief Judge.

depositions must be admissible, and admissibility usually requires the declarant or affiant's personal knowledge. *See* Fed. R. Civ. P 56(c)(4); Fed. R. Evid. 602. "Inasmuch as summary judgment procedure lacks the safeguard of cross-examination of an affiant, it is important that it be shown that he is competent to testify to the matters therein stated and that the facts to which he swears are admissible under the rules of evidence." *Am. Securit Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958).

Jarolin-Bogert submitted a declaration in support of her Local Rule 56.1 statement of additional facts. *See* [64-1]. Portions of the declaration assert facts without a proper foundation or basis to determine whether Jarolin-Bogert has personal knowledge of the facts. For example, Jarolin-Bogert asserts that in March 2019 another employee asked for and was given a vacation day. [83] ¶ 30 *citing* [54-1] ¶ 14. But she provides no foundation for how she knows the fact—did she observe the employee ask? Did the employee tell Jarolin-Bogert about the request? Did she see it on a business record? Without knowing the source of her knowledge it is impossible to know whether the testimony is admissible. *See Packer v. Trustees of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 850 (7th Cir. 2015) (rejecting facts asserted in affidavit where the affidavit does not provide foundation for affiant's personal knowledge of those facts). For that reason, portions of ¶¶ 15, 28, 30, 31, 32, 34, 35, and 36 of Jarolin-Bogert's statement of additional facts are struck. Similarly, denials of an asserted fact must be supported by admissible evidence, so Jarolin-Bogert's objections to ¶¶ 24, 32, 38, 42, and 63 of defendant's statement of facts are overruled

to the extent they rely solely on those portions of Jarolin-Bogert's declaration that are unsupported by personal knowledge.

Finally, a party cannot set forth additional new facts in its response, meaning "facts that are not fairly responsive to the asserted fact." N. D. Ill. L. R. 56.1(e)(2). Jarolin-Bogert asserts new facts in her response to ¶¶ 40 and 43 of defendant's 56.1 statement and does not include those facts in her own statement of additional facts. I note this deviation from the rules, but exercise my discretion to consider evidence in the record when evaluating defendant's motion. *See* Fed. R. Civ. P. 56(c)(3).

## III.    Facts

### A.    Jarolin-Bogert's Position and Workload

Lisa Jarolin-Bogert worked for the Cook County Social Service Department from 1990 to 2021 as an Intake Liaison Caseworker or Court Liaison, a union position. [63] ¶ 4; [83] ¶ 1.[2] The Social Service Department is a unit of local

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of fact and additional facts where both the asserted fact and response are set forth in one document. [63], [83]. Both parties made unsupported objections or repeated arguments made about other statements that are irrelevant to the asserted fact; those objections are overruled. *See* [63] ¶¶ 32, 34; [83] ¶ 9. Defendant objects to several of Jarolin-Bogert's statements of additional facts on the basis that they are immaterial but does not proffer any legal argument about why the fact is inadmissible or evidence that controverts the asserted fact, so those objections are overruled. *See* [83] ¶¶ 7, 10, 12, 14, 17–18, 21, 24, 37. I make a separate determination about whether any fact is material to the outcome of the case. Where the parties dispute facts and both rely on admissible evidence, I set forth all of the facts. *See* [63] ¶ 12 *and* [83] ¶ 4, [63] ¶ 24 *and* [83] ¶ 13, [63] ¶¶ 9–10 *and* [83] ¶¶ 9–10.

government within the Office of the Chief Judge of Cook County Courts. [63] ¶ 3.[3] Jarolin-Bogert's immediate supervisor was Alyson Brodner, who supervised six employees, all of whom were either court liaisons or caseworkers. [63] ¶ 5; [83] ¶ 40.

As a Court Liaison for the Social Service Department, Jarolin-Bogert represented caseworkers during court proceedings, filed petitions, prepared court calls, and made sure paperwork was in order for the judge. [63] ¶ 7; [83] ¶ 3. Jarolin-Bogert, who is female, and Ross Perrotte were the only Court Liaisons who attended court and were supervised by Brodner. [63] ¶¶ 2, 9; [83] ¶ 40.[4] They each managed four or five court calls per month, but Jarolin-Bogert's court calls had more cases than Perrotte's. [63] ¶ 9; [83] ¶ 10. Jarolin-Bogert estimated that Perrotte had a third of her court work because he only worked in the traffic and domestic violence courtrooms and she covered eight courtrooms. [83] ¶ 9. Jarolin-Bogert, Perrotte, and another court liaison also worked on the intake desk; Perrotte and the third court liaison were responsible for more intake days than Jarolin-Bogert. [63] ¶ 8. Supervisor Brodner testified that she would not say that Jarolin-Bogert's workload was larger than Perrotte's workload. [63] ¶ 10.

---

[3] The Social Service Department is one of two departments that provides oversight and services to adults who are sentenced to probation and primarily oversees misdemeanor offenders. *See* "Probation for Adults," https://www.cookcountycourt.org/ABOUT-THE-COURT/Office-of-the-Chief-Judge/Probation-Departments/Probation-for-Adults, (last visited on September 13, 2023).

[4] Neither party puts Perrotte's sex into evidence. Because parties generally refer to Perrotte as "Mr. Perrotte" and the context of their brief indicates that Perrotte is male, I accept for purposes of determining whether Jarolin-Bogert was discriminated on the basis of her sex, that Perrotte was understood to be male.

### B.      Requesting Time Off

The Social Service Department's collective bargaining agreement states that approval of any benefit time is subject to operational needs of the department; if two or more employees performing the same job request vacation on the same day and they can't be released at the same time, then vacation requests should be granted in order of the employee's seniority. [63] ¶ 14; [83] ¶ 11. For Brodner's unit, the "operational needs" to be considered were court coverage, intake coverage, client appointments, and the office schedule. [63] ¶ 15.

Because Brodner would deny a vacation request if the employee did not have coverage, the prescribed practice was to meet with the employee requesting benefit time to confirm that employee had found coverage for all of their job responsibilities. [63] ¶¶ 15–17.[5] Jarolin-Bogert could find coverage by asking one of her colleagues because all of her documents were pre-filed; she had previously asked a caseworker in Brodner's unit to cover her court call. [63] ¶¶ 17, 19. On at least one occasion in late 2015, Brodner asked Jarolin-Bogert to find coverage for her vacation. [63] ¶ 18;

---

[5] Jarolin-Bogert objects to ¶¶ 15–16 because in March 2018 Jarolin-Bogert was forced to find coverage for Perrotte as well as herself. *See* [63] ¶¶ 15–16. This is not in direct contradiction to facts asserted which have to do with an employee's general duty to find coverage for their days off. Vanessa Whitehead, deputy director of human resources, testified that a supervisor should meet with their supervisee before approving vacation time so they can discuss coverage. [50-9] at 17:1–7. Jarolin-Bogert's general assertion that Perrotte did not have to find coverage is not supported by admissible evidence. Jarolin-Bogert's deposition testimony does not establish a foundation for her statement that Perrotte never had to find people to cover him. *See* [50-2] at 64:15–65:2. The objections are overruled.

[50-13].[6] Brodner denied Jarolin-Bogert's requests for personal time due to operational needs in 2018 and 2019. [63] ¶ 20.

### 1. *2018 Requests*

On February 14, 2018, Jarolin-Bogert submitted a request for a week-long vacation in March of the same year. [63] ¶ 21; [83] ¶ 12. On the same day, Perrotte submitted a request for the same week. [63] ¶ 21; [83] ¶ 12. In previous years the two would take vacation during different weeks in March so they could cover for each other. [63] ¶ 23. Brodner consulted with her direct supervisor who determined that both Jarolin-Bogert and Perrotte should not be off work at the same time. [63] ¶ 22. The parties disagree about what happened next.

Defendant asserts that Brodner told Jarolin-Bogert and Perrotte to work it out and split the week up before any decision was made about either request. [63] ¶ 24. On March 12, 2018, Brodner told Jarolin-Bogert that she would approve her time-off request if Jarolin-Bogert found coverage and told Brodner about her arrangements. [63] ¶ 25. Jarolin-Bogert took the time off in March 2018. [63] ¶ 26.

Jarolin-Bogert says her request was denied and there was no discussion about her and Perrotte working it out between themselves. [83] ¶ 13. Jarolin-Bogert sent Brodner a memo listing all of the reasons she needed the time off and was told that Vanessa Whitehead, the deputy director of human resources, had made the decision

---

[6] Jarolin-Bogert's objection to ¶ 18 is overruled. *See* [63] ¶ 18. The fact that Jarolin-Bogert had to find coverage for Perrotte in March 2018 does not contradict the fact that Brodner asked Jarolin-Bogert to find coverage as early as 2015. *See* [50-13]. Jarolin-Bogert's assertion that Perrotte never had to find coverage is inadmissible because it lacks a foundation for her personal knowledge of that fact. *See* [50-2] at 64:15–65:2.

7

to deny her request. [83] ¶ 13. Jarolin-Bogert then spoke with Whitehead and relayed the reasons that she needed the time off. [83] ¶ 14. Whitehead told her, "Why don't you just put your son in the YMCA." *Id*. Jarolin-Bogert replied that she had put her request in first, she was senior to Perrotte, and that she did not understand why Perrotte's request had been granted when hers was denied. *Id*. Whitehead said, "I'm sick and tired of all the old people getting what they want." *Id*. Jarolin-Bogert also told both Whitehead and Brodner that she felt like the male employees in the department were treated better than female employees. [83] ¶ 17.

At some point, Whitehead sent Jarolin-Bogert an agreement that she would be granted the week in March off in exchange for not taking any time off in Christmas. [83] ¶ 18. The union was not made aware of the agreement. *Id*. Jarolin-Bogert did not tell Whitehead that she agreed and she did not sign the agreement, but she was granted the time off in March. *Id*. Brodner met with both Jarolin-Bogert and Perrotte before their respective vacations to review their coverage plans. [63] ¶¶ 27–28. Jarolin-Bogert testified that she had to find coverage for herself and Perrotte. [83] ¶ 15.[7]

---

[7] Defendant objects to the portions of ¶ 15 that say that Perrotte never had to find coverage when he took time off and that Perrotte acknowledged this when he told her that he couldn't believe that Brodner made her find coverage when he didn't have to. [83] ¶ 15. Perrotte's out-of-court statement that "she doesn't make me find coverage" is offered to prove the truth of the matter asserted and was not a statement within the scope of his employment. It is not a statement of the party opponent and is inadmissible. Fed. R. Evid. 801. As discussed above, Jarolin-Bogert's deposition testimony does not provide an adequate foundation for the assertion that Perrotte never had to find coverage. *See* [50-2] at 64:15–65:2. The second and third sentences of ¶ 15 are struck because they are inadmissible. Additionally, defendant objects to ¶ 16 of plaintiff's statement of additional facts. [83] ¶ 16. Plaintiff's testimony, "there was never a time where I would have to ask [Brodner] to cover my cases," [50-2] at

On May 1, 2018, an investigatory interview was held regarding Jarolin-Bogert's failure to sign the agreement. [83] ¶ 19. On May 16, 2018, the union sent an email to Whitehead and Brodner advising them that Jarolin-Bogert should be able to request her vacation as any other employee and advising they should "cease and desist" trying to get Jarolin-Bogert to give up her request for vacation time during Christmas. *Id*. In July 2018, Jarolin-Bogert was disciplined for not signing the agreement and told she would not be given benefit time during the week of Christmas 2018 as a consequence. [83] ¶ 21.

In May 2018, after receiving the email from the union about Jarolin-Bogert's vacation request, Brodner told Perrotte to submit a request for time off in December 2018 and January 2019, contrary to her practice of only allowing an employee to submit requests six months or less in advance. [63] ¶ 29; [83] ¶ 20.[8] Brodner's

---

72:1–4, does not support the assertion that "Brodner never covered Plaintiff's work on days off she needed." [83] ¶ 16. The fact asserted assumes that Brodner refused to cover Jarolin-Bogert's time off after being asked to do so, but the cited testimony is that Jarolin-Bogert never asked Brodner to cover for her. Defendant's objection is sustained and that clause of ¶ 16 is struck.

[8] Defendant objects to the portion of ¶ 20 that asserts that Brodner told Perrotte to put in his request for time off after she received the cease and desist from the union. [83] ¶ 20. Jarolin-Bogert testified at her deposition—"Vanessa sent a copy to Alyson or Alyson already had it on her computer. And she came into work, and I believe she started at 11:00 o'clock that day. And she read it. And shortly thereafter she told Ross to put his vacation time in for Christmas" and "[Brodner] got into work. I remember this. 11:10 she went to Ross' office. She told Ross, 'Put your vacation time in for Christmas.'" [50-2] at 97:9–14, 97:23–98:2. Defendant argues that this testimony is not based on Jarolin-Bogert's personal knowledge. [83] ¶ 20. The testimony supports a reasonable inference that Jarolin-Bogert observed and heard Brodner's instruction to Perrotte, and although the timing is uncertain, there is enough to infer that Jarolin-Bogert's union sent the cease-and-desist email on May 16, before Brodner told Perrotte to submit his time-off request. *See* [50-2] at 97:5–10 ("[Whitehead] received that [email], I believe—it was the second week in May, maybe 5-16 or something like that. And the very next day—whatever day was after that. It could have been—I'm sorry. [Whitehead]

9

supervisor told her to approve the request. [63] ¶ 30. There is nothing in the record about whether the request was approved or not.

Later in July 2018, Jarolin-Bogert submitted a request for time off on December 27 and 28, 2018. [63] ¶ 31; [83] ¶ 22. The request was still pending in August 2018 and Jarolin-Bogert filed an EEOC charge on or about August 21, 2018, for denying her requested leave. [83] ¶ 22; [63] ¶ 59.[9] In October 2018, Jarolin-Bogert told Brodner that she could do extra work in advance to prepare and that she did not have court on either of the days requested. [83] ¶ 23. Brodner denied the request for December 27 and 28, 2018, and said that it was due to the disciplinary action against Jarolin-Bogert and operational needs. *Id*.; [63] ¶ 32.[10] Jarolin-Bogert sought to discuss the issue with the Office of the Chief Judge's Human Resources Representative but did not receive a response to her voicemail messages. [83] ¶ 24.

Jarolin-Bogert sent emails on December 26 and 27, 2018, notifying Brodner that she would be taking FMLA leave the next day and using a vacation day to cover

---

sent a copy to [Brodner] or [Brodner] already had it on her computer."). Defendant's objection is overruled.

[9] The August 2018 EEOC charge alleged retaliation and age discrimination. [63] ¶ 59. Jarolin-Bogert told three of her co-workers, including Perrotte, about the EEOC charge, but did not tell Brodner directly. [83] ¶ 36. I omit the portion of ¶ 36 about Jarolin-Bogert's belief that one of the three co-workers told Brodner of the charge because Jarolin-Bogert does not state a foundation for that belief in her deposition testimony or declaration. *See* [50-2] at 137:5–14 *and* [64-1] ¶ 21.

[10] Jarolin-Bogert objects to ¶ 32 on two bases. First, that there was no pending discipline in July 2018 because the discipline had been dismissed in an arbitration between defendant and the union in June. [63] ¶ 32. Jarolin-Bogert does not cite to any evidence to support her assertion, so the objection is overruled. Second, Jarolin-Bogert objects to the fact that Brodner denied her request due to operational needs because Jarolin-Bogert had demonstrated to Brodner that there were no pending court calls and her court work could be pre-filed. [63] ¶ 32. Jarolin-Bogert's disagreement with the reasoning does not controvert that one of the stated reasons for the denial was operational needs so the objection is overruled.

the time. [63] ¶ 33; [50-10] at 1. Jarolin-Bogert's request was denied because of lack of coverage and the time was converted to unpaid time. [63] ¶ 34. The director of the Social Services Department told Whitehead to direct the timekeeper to covert the time to unpaid time. [63] ¶ 35.

### 2. *2019 Requests*

In January 2019, Jarolin-Bogert requested time off for December 26–31, 2019. [83] ¶ 27; [63] ¶ 37. The request was denied because she did not have any accrued vacation time when she made the request and she did not provide a full accounting of her coverage for the requested days. [83] ¶ 27; [63] ¶ 38.[11] In August 2019, Perrotte submitted a request for time off in December 2019 that overlapped with Jarolin-Bogert's request; his request was denied. [83] ¶ 29; [63] ¶¶ 39–40. Jarolin-Bogert and Perrotte ended up splitting the four days that were overlapped, but used sick time without permission. [63] ¶¶ 40, 58.

On March 15, 2019, Jarolin-Bogert submitted a request for vacation time for June 10–14, 2019. [83] ¶ 30. Plaintiff filed a grievance when Brodner did not approve her request in a timely manner. *Id.* Jarolin-Bogert's request was approved on March

---

[11] Jarolin-Bogert objects to ¶ 38 because she testified that the collective bargaining agreement does not require a member to have vacation time accrued at the time the vacation is requested. [63] ¶ 38. But Jarolin-Bogert does not cite to the CBA to determine what it says about vacation requests when the employee has not accrued the requisite days. Jarolin-Bogert also objects to ¶ 38 because she had never been required to provide coverage so long before the dates of the vacation. [63] ¶ 38. That does not controvert the asserted fact because there is no evidence that Jarolin-Bogert had ever put in a request so long before the dates of the vacation. Furthermore, there is evidence in the record that the prescribed practice was for a supervisor to meet with the employee and discuss coverage and if the employee did not find coverage, the supervisor would deny the request. *See* [63] ¶¶ 15–16. Plaintiff's objection is overruled.

11

25, 2019, after she lined up coverage for her court work. [83] ¶ 32. Plaintiff had to make up her intake days. *Id.* In June 2019, Jarolin-Bogert filed a charge of discrimination with the EEOC alleging discrimination on the basis of sex and disability, a hostile work environment, and retaliation for her August 2018 EEOC charge. [63] ¶¶ 61–62; [50-17].

There were two instances when Jarolin-Bogert requested time off for medical reasons for herself or her family. On March 25, 2019, she asked for half of a day for medical reasons and had to find coverage for her position before the request was approved. [83] ¶ 31. On April 3, 2019, Jarolin-Bogert told Brodner that her husband was going to have colon surgery on April 10, 2019. [83] ¶ 33. Brodner told Jarolin-Bogert that she had a court call that day and that Perrotte was in training. *Id.*[12] There is no indication in the record whether or not Jarolin-Bogert was able to take the day off.

Defendant states that in the fall of 2019 Jarolin-Bogert stopped meeting with Brodner to discuss coverage for her days off. [63] ¶ 36. Jarolin-Bogert asserts that she continued to meet with Brodner to discuss coverage and she would advise Brodner when she found coverage. [83] ¶ 26. Defendant also asserts that Brodner never denied a request by Jarolin-Bogert for vacation as long as she had coverage and never

---

[12] Defendant objects to the portion of ¶ 33 stating that Brodner's comments about Jarolin-Bogert's court call and Perrotte's training "suggest[ed] that she was not inclined to grant any request by Plaintiff for that day off." [83] ¶ 33. Defendant argues Jarolin-Bogert's declaration does not show a foundation for personal knowledge of Brodner's state of mind. I agree. Jarolin-Bogert can competently testify about what she understood from the comments, but she cannot testify about what Brodner intended to communicate. I include the comments themselves but strike the last clause of the last sentence of ¶ 33.

approved a request by Perrotte for vacation time when he did not have coverage. [63] ¶¶ 41, 42.[13] Perrotte was reprimanded twice since 2012 for misuse of benefit time, including the December 2019 incident. [63] ¶ 58.

## C. Performance Reviews and Feedback

Jarolin-Bogert received satisfactory performance reviews for 2016, 2018, 2019, and 2020. [63] ¶¶ 47–48, 51–56; [83] ¶ 2. Brodner's comments on these reviews noted that Jarolin-Bogert was inconsistent in data entry and made errors on intake paperwork. [63] ¶¶ 47–48, 51–56.[14] When Brodner issued Jarolin-Bogert her 2018 annual performance review, she indicated that the reason for the "satisfactory" rating was the grievances and "other things." [83] ¶ 37. Receiving a "satisfactory" rating meant that Jarolin-Bogert was not eligible for a bonus. *Id.* Perrotte received an

---

[13] Jarolin-Bogert objects to ¶ 41 on the basis that her July 2018 request for time off in December 2018 was denied due to her disciplinary action. [63] ¶ 41. Defendant's stated reason for denying the July 2018 request was the disciplinary action *and* operational needs. *See* [63] ¶ 32. The objection is overruled. Jarolin-Bogert disputes ¶ 42 and asserts that in February 2018, Perrotte was granted vacation time for March 22–30, 2018 without needing to find coverage because she had to find coverage for both of them. [63] ¶ 42. The deposition testimony she relies upon states, "But Ross did not have to find coverage. So then I would have to find coverage myself and his court work because he was granted the opportunity to take that benefit time and I wasn't in the beginning. So it all came to me and then I was to find people to cover both our positions." [50-2] at 59:19–61:17. This does not controvert defendant's assertion; it establishes that in March 2018 Jarolin-Bogert had to find coverage for both herself and Perrotte but does not show that Perrotte was granted the time without providing notice of who would cover him first. I overrule the objection.

[14] The parties disagree about whether Jarolin-Bogert made more errors than Perrotte. *See* [63] ¶ 11. Brodner testified generally that Jarolin-Bogert made more errors but doesn't say in the cited material to whom she was comparing Jarolin-Bogert. *See* [50-3] at 86:14–16. Jarolin-Bogert argues that while she may have had more errors than Perrotte, she also had more cases, so in terms of error per case, she had the same rate as Perrotte. [64-1] ¶ 6. She cites nothing for this assertion. Neither party has cited to or relied on admissible evidence to show that Jarolin-Bogert made more, or less, errors than Perrotte, so I am disregarding any evidence on the issue.

"exemplary" rating in 2018. *Id.* Jarolin-Bogert received an "exemplary" rating in 2017. [63] ¶¶ 49–50; [83] ¶ 2.

Starting with the 2019 performance review, Brodner noted that Jarolin-Bogert did not secure coverage for all of her job functions while on benefit time. [63] ¶¶ 54–56. On Jarolin-Bogert's 2019 Performance Evaluation, Brodner noted that Jarolin-Bogert had not prepared coverage for her job functions while on leave and rated her as "needs improvement" in the "Keeps Supervisor Informed of Emerging Issues" section. [63] ¶¶ 54, 57. Brodner testified that she gave Jarolin-Bogert that rating because Jarolin-Bogert "did not share with me issues and concerns that were happening in court … she was not communicating with me about court issues and was—became hostile in every situation where we had a conversation." [50-3] at 87:17–22; [63] ¶ 57.[15]

Jarolin-Bogert did not like the way that Brodner gave her feedback and she felt that Brodner treated male colleagues differently when they made mistakes. As to the first issue, Brodner would mark Jarolin-Bogert's work with yellow highlighter and put sticky notes on her documents and envelopes on her chair regarding errors. [83] ¶ 8; [63] ¶ 44. Jarolin-Bogert asked Brodner to meet with her in person to discuss errors or to wait until the end of the day to give her all of them at once. [63] ¶ 45.

---

[15] Defendant's statement of facts mistakenly refers to 2020 performance evaluation, but Brodner's testimony is about the 2019 performance evaluation, completed in September 2020. *Compare* [63] ¶ 57 *with* [50-3] at 87:6–24. I refer to the 2019 performance evaluation.

Jarolin-Boger felt that Brodner treated Perrotte differently by fixing the errors on his intake paperwork instead of giving it back to him to fix himself. [83] ¶ 8.[16]

Jarolin-Bogert would point out mistakes made by other caseworkers to Brodner such as inaccurate docket numbers or missing information. [83] ¶ 4; [63] ¶ 12.[17] When Jarolin-Bogert pointed out mistakes made by two male caseworkers, C.C. and D.L., Brodner would become noticeably irritated with her and say, "I don't have time for that," or "I'll let him know." [83] ¶ 5. Jarolin-Bogert felt that Brodner did not do anything about the mistakes although she did not know whether Brodner did or didn't talk to D.L. *Id.*; [50-2] at 68:3–69:21.[18] The issue was particularly acute with D.L.; Jarolin-Bogert pointed out D.L.'s errors to Brodner on at least ten occasions. [83] ¶¶ 6–7. On one occasion, D.L. submitted a document that had incorrect docket numbers and other errors. [83] ¶ 7. When Jarolin-Bogert brought those errors to Brodner's attention, Brodner became clearly irritated. *Id.* Brodner made the

---

[16] Defendant objects to ¶ 8 because the cited material only states that Brodner fixed mistakes on Perrotte's intake paperwork, not all work. [83] ¶ 8. Jarolin-Bogert testified at her deposition that Brodner "would fix things on Ross' intakes. Instead of handing them back with yellow highlighter on them because something's missing, she would just go ahead and fix his intakes." [50-2] at 69:3–7. The other relevant portion of the deposition cited only references intakes. *See* [50-2] at 143:1–3 ("not to mention changing Ross' intakes, which doesn't impact me as much as the court work impacts me."). The cited material supports the assertion that Brodner fixed Perrotte's intake paperwork, so I accept ¶ 8 with that limitation.

[17] The parties disagree about whether Jarolin-Bogert only complained about others' mistakes when it affected her work or whether she made complaints about mistakes that did not affect her. *See* [63] ¶ 12 *and* [83] ¶ 4. I note the dispute and draw no conclusion.

[18] Defendant objects to ¶¶ 5–6 on the basis that the cited material does not support the assertion that Brodner never did anything about D.L.'s mistakes because Jarolin-Bogert later testified that she did not know whether Brodner ever spoke with D.L or not. *See* [83] ¶¶ 5–6. Jarolin-Bogert testified that to her it did not seem like Brodner did anything but that she did not know for a fact whether Brodner had a conversation with D.L. or not. [50-2] at 68:11–21. I accept that assertion and make clear that Jarolin-Bogert does not know what, if anything, Brodner did in response to her complaints regarding D.L.

corrections and left the document on Jarolin-Bogert's chair with a sticky note that said, "Why are you targeting [D.L.] and his countryman?" *Id*.[19] Jarolin-Bogert was not in a supervisory position over D.L. [63] ¶ 13.

Jarolin-Bogert believes that Brodner did not like her because she spoke her mind, had good relationships with other departments, and brought up issues that Brodner did not want to deal with; Jarolin-Bogert also testified that it was because she was a "strong female." [63] ¶ 43; *see also* [50-2] at 173:14–15. Jarolin-Bogert testified that she could think of four times off the top of her head that Brodner called another employee Jarolin-Bogert's "girlfriend." [63] ¶ 46; [83] ¶ 34; [50-2] at 144:10–20. Jarolin-Bogert observed that Brodner was very cordial with Perrotte and another male colleague; Brodner and Perrotte would spend the workday together. [83] ¶ 35. In contrast, Brodner was curt with Jarolin-Bogert. *Id*.

## D. Return from FMLA Leave

Jarolin-Bogert had to go on medical leave for approximately seven weeks in early 2021. [83] ¶ 38.[20] After the leave ended, Jarolin-Bogert met with Whitehead to discuss her return to work. *Id*. At the meeting, Whitehead told Jarolin-Bogert that

---

[19] Both D.L. and the employee who was the subject of the document are of Polish national origin. [83] ¶ 7.

[20] Defendant argues that facts regarding Jarolin-Bogert's return from medical leave, change in job circumstances, and decision to retire should not be considered because they post-date her EEOC charge and were not mentioned in her complaint. [82] at 6; [83] ¶¶ 38–39. But defendant first makes this argument in its reply brief, thereby waiving the argument. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020); *see also Gibson v. West*, 201 F.3d 990, 993 (7th Cir. 2000) (failure to exhaust administrative remedies is not a jurisdictional flaw and so is subject to waiver and estoppel). Furthermore, Jarolin-Bogert discussed what happened in April 2021 during her deposition so defendant was on notice that it was part of the factual record.

she would be doing primarily intake work instead of acting as a court liaison. [83] ¶ 39. Perrotte and another employee junior to Jarolin-Bogert were to take her former job duties. *Id*. As a result of being stripped of her courtroom duties, Jarolin-Bogert decided to retire. *Id*.

Brodner did not learn of Jarolin-Bogert's 2018 and 2019 EEOC charges until the day before her deposition in this matter. [63] ¶ 63.[21] Whitehead learned of Jarolin-Bogert's 2018 EEOC charge about a month after it was filed. [63] ¶ 64. The record does not reflect when she learned of Jarolin-Bogert's 2019 charge. Whitehead testified that she did not discuss Jarolin-Bogert's EEOC charges with Brodner. [63] ¶ 64. The director of the department who instructed the timekeeper to change Jarolin-Bogert's time from paid to unpaid in December 2018 was not aware of her 2018 EEOC charge at the time she issued the instruction. [63] ¶ 65.

## III. Analysis

### A. Gender Discrimination

To determine whether an employer discriminated against its employee because the employee belonged to a protected class, a court should ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

---

[21] Jarolin-Bogert disputes ¶ 63 on the basis that she told three coworkers about the 2018 EEOC charge and she believes that at least one of them would have told Brodner. [63] ¶ 63. But believing that someone told Brodner of the charge is different than knowing that someone told Brodner of the charge. Neither Jarolin-Bogert's declaration nor her deposition testimony provide a basis to infer that Brodner knew about the 2018 EEOC charge. *See* [64-1] ¶ 21 *and* [50-2] at 137:5–14. The objection is overruled.

Plaintiffs may organize their evidence in the *McDonnell Douglas* burden-shifting framework. *See Khungar v. Access Cmty. Healthcare Network*, 985 F.3d 565, 573 (7th Cir. 2021). Under that framework, a plaintiff makes a *prima facie* case of discrimination when she shows, "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Id.* (internal citations omitted). Once a plaintiff makes a *prima facie* case, the burden shifts to the defendant to give a "legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal citations omitted). The parties chose to employ the *McDonnell Douglas* framework in their briefs.

Jarolin-Bogert argues that she was discriminated against on the basis of her sex when her vacation requests were denied in 2018 and 2019; she also makes a claim of a hostile work environment, again on the basis of sex.

### 1.  *Benefit Time Requests*

Under both the *McDonnell Douglas* burden-shifting framework and the *Ortiz* record-as-a-whole analysis, an employee must have experienced an "adverse employment action" in order to proceed with their employment discrimination claim. *See Ortiz*, 834 F.3d at 765. An adverse employment action is a "materially adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v.* Bliss, 864 F.3d

541, 552 (7th Cir. 2017) (internal citation omitted). Actionable changes can generally be divided into three groups: "(1) diminishing an employee's compensation, fringe benefits, or other financial terms of employment, including termination; (2) reducing long-term career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted; and (3) changing the conditions in which an employee works in a way that subjects him to a humiliating, degrading, unsafe, healthful, or otherwise significantly negative alteration in his work place environment." *Alamo*, 864 F.3d at 552 (citing *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)) (cleaned up).

Jarolin-Bogert asserts that the collective bargaining agreement granted her a contractual right to vacation time and to have her requests for vacation given precedence over more junior colleagues' requests. She argues that when defendant denied her vacation requests, especially when a more junior colleague's request was approved for the same time period, defendant violated her contractual rights, constituting an adverse employment action.

Denial of a benefit conferred by contract can be an adverse action, but the more discretion that an employer has in determining whether or how to give a material benefit, the less likely it is that denial of that benefit will be an adverse employment action. *See Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004). Applying that principle to vacation time, courts have found that the *loss* of vacation time is an adverse employment action, *see Duncan v. Thorek Mem'l Hosp.*, 784

19

F.Supp.2d 910, 919 (N.D. Ill. 2011), but not being able to use vacation time exactly when requested is not. *See Mahran v. Advoc. Health & Hosps. Corp.,* No. 17 C 5730, 2019 WL 952131, at *10 (N.D. Ill. Feb. 26, 2019) ("The refusal to honor an employee's preferred vacation schedule amounts to merely an inconvenience and does not materially alter the terms and conditions of the employee's job."), *aff'd sub nom. Mahran v. Advoc. Christ Med. Ctr.,* 12 F.4th 708 (7th Cir. 2021); *see also, Griffin v. Potter,* 356 F.3d 824, 829 (7th Cir. 2004).

The terms of the collective bargaining agreement between defendant and the union confer a right to a certain amount of vacation time but condition the use of that vacation time on employer approval based on "operational needs" of the department. *See* [63] ¶ 14; [83] ¶ 11. The contract states that defendant has a say in *when* an employee can use their vacation time. Jarolin-Bogert has not shown any evidence that her vacation time was taken away from her; instead her requests to take vacation at particular times were denied. In March 2018, Jarolin-Bogert's request to use vacation time was initially denied, but there is no evidence in the record that she was docked vacation hours. *See* [63] ¶¶ 21–26; [83] ¶¶ 12–19. Even the agreement to take vacation time in March in exchange for not taking vacation time in December 2018 only sought to control *when* Jarolin-Bogert took her time, not the amount of paid time off she had. *See* [83] ¶¶ 18–19. In December 2018, Jarolin-Bogert's time was converted from vacation to unpaid time, but she had not previously received permission to use vacation time for those days. *See* [63] ¶¶ 33–35. Jarolin-Bogert's initial request for vacation in December 2019 was denied. She ended up taking time

off in December 2019 but had to use sick time to cover two days. [63] ¶¶ 38, 40. However, Jarolin-Bogert has not submitted any evidence to show that her request for those two days had been previously approved, such that vacation time that she had been told she could use was taken away from her. *See* [83] ¶¶ 27, 29; [63] ¶¶ 37–39. According to the record, none of the instances of Jarolin-Bogert's vacation requests being denied resulted in her losing benefit time.

Jarolin-Bogert argues that granting Perrotte vacation time when she had an earlier request and was more senior is an adverse employment action because the collective bargaining agreement gives her a right to have her requests honored before a more junior colleague's request. A violation of a collective bargaining agreement can be, but is not necessarily, an adverse employment action—the two vindicate different interests and are enforced via different procedures. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–52 (1974) (discussing the difference between collective bargaining rights and rights under Title VII); *see, for example, Dimitracopoulos v. City of New York*, 26 F.Supp.3d 200, 213 (E.D.N.Y. 2014) (assigning work in violation of the collective bargaining unit is not a materially adverse employment action unless it is so burdensome so as to constitute a departure from normal practice, recourse is grievance through the union). Here, the fact that Perrotte's request was approved before Jarolin-Bogert's seems to be a violation of the collective bargaining agreement, but it did not materially change Jarolin-Bogert's financial compensation or benefits. She still had the same vacation hours and could use them, subject to her supervisor's approval, at another point in time.

Jarolin-Bogert's final argument is that defendant has not given a "legitimate non-discriminatory rationale why her non-discretionary (albeit subject to Defendant's operational needs) benefit time was denied in March of 2018, December 2018, and December 2019." [66] at 12. This puts the cart before the horse. Jarolin-Bogert has not shown that defendant deprived her of vacation hours or any other financial terms of her employment. And under the terms of the collective bargaining agreement itself, defendant had the ability to deny an employee's request to use vacation time when operational needs required. Jarolin-Bogert has not shown that the denial of her requests constituted an actionable adverse employment action. Jarolin-Bogert cites to *Lewis v. City of Chicago* to support her argument that requiring an adverse employment action should not allow an employer to discriminate "and then hide behind the argument that the employee's deprivation was not material." *See* 496 F.3d 645, 654 (7th Cir. 2007). But there's no hiding here—the deprivation is undisputed; the employer did not allow Jarolin-Bogert to take vacation time when she wanted. How that affected the terms and conditions of employment is also undisputed: it did not affect the financial terms of her employment. Jarolin-Bogert was likely frustrated and unhappy, but the material terms of her employment were not diminished by the denial of her vacation requests.

Because Jarolin-Bogert has not shown that her vacation time was taken away from her or that the benefit time was illusory because she could never use it, she has not shown that she suffered an adverse employment action when defendant denied her vacation requests.

22

2. *Hostile Work Environment*

Discrimination can also take the form of a hostile work environment "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1115 (7th Cir. 2022) (internal citation omitted). The elements of such a claim are: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Scaife*, 49 F.4th at 1115–16. Courts use a totality of circumstances test and consider the frequency of discriminatory conduct, how offensive a reasonable person would determine the conduct to be, whether it is physically threatening or causes humiliation as opposed to verbal abuse, whether it unreasonably interferes with an employee's work performance, and whether it is directed at the plaintiff, to determine whether the conduct is severe or pervasive. *Id.* at 116.

Taking all of the facts in evidence and all reasonable inferences in favor of Jarolin-Bogert, there is not sufficient evidence of harassment or discrimination that made the work environment objectively offensive in a way that was severe or pervasive. Jarolin-Bogert argues that Brodner and management created a hostile work environment when they denied her benefit time, conspired to allow Perrotte to request time off before Jarolin-Bogert, gave her feedback in a format she disliked, accused her of sabotaging her male co-workers, assigned her a considerably greater

23

workload, treated her less courteously then male colleagues, rated her as merely "satisfactory" on performance reviews, called a colleague her "girlfriend," and removed her from the position performing court calls. [66] at 13.

None of this, considered together, constitutes the kind of harassment or humiliation that is necessary to allege a hostile work environment. *See Scaife*, 49 F.4th at 1114–15, 1117–18 (supervisor demeaned employee during conversations, accused her of performing her job illegally, threatened her job, and yelled at her multiple times in an aggressive manner, but conduct was not sufficiently severe or pervasive to constitute a hostile work environment); *Brooks v. Avancez*, 39 F.4th 424, 441–42 (7th Cir. 2022) (co-workers swearing at plaintiff, refusing to follow plaintiff's directions, and using disrespectful language to plaintiff is not sufficient to find hostile work environment); *Mahran*, 12 F.4th at 715–16 (denying specialized training, rejecting request for vacation time, hiring other colleagues to full-time positions before him, and some offensive comments did not constitute a hostile work environment).

Secondly, Jarolin-Bogert has not provided evidence that the above conduct occurred *because* she was female. In her statement of facts Jarolin-Bogert asserts that Brodner did not require male co-workers to find coverage or make up intake work when they used their benefit time, did not follow up on errors made by a male co-worker, and yelled explosively at another female coworker, but Jarolin-Bogert fails to provide competent evidence of this differential treatment. It is not clear that Brodner calling another employee Jarolin-Bogert's "girlfriend" was derogatory in

nature. Drawing the inference in plaintiff's favor that Brodner meant it in a derogatory manner, there is no evidence that Jarolin-Bogert asked her to stop, reported it to HR, or that it occurred more than four times in eight years. There is no evidence that this was pervasive conduct. Finally, Jarolin-Bogert testified that she believed Brodner did not like her because she was a "strong female." [50-2] at 173:13–15. But Jarolin-Bogert's own subjective belief, without more, is insufficient to show that Brodner harbored any prejudice against other women. *See Brooks*, 39 F.4th at 436–37 ("Guessing at an employer's hidden animus or inner prejudice, however, is not enough to defeat summary judgment. The employee must support her hunch with evidence.").

The record does not contain evidence to support Jarolin-Bogert's claim that there was a hostile work environment based on her sex at the Social Services Department.

### B. Retaliation

Title VII protects an employee who has acted to oppose an unlawful employment practice from retaliation by her employer. *Lewis v. City of Chicago*, 496 F.3d 645, 654–55 (7th Cir. 2007). To prevail on a retaliation claim a plaintiff must show that "(1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 655. The parties agree that Jarolin-Bogert engaged in protected activity when she submitted the August 2018 and June 2019 EEOC charges. Jarolin-Bogert also argues that she engaged in protected activity when she complained to

Brodner and Whitehead that men were being treated better than women in March 2018. [66] at 14. The parties contest the last two elements—adverse action and causal connection.

An adverse action for purposes of a retaliation claim is anything that would dissuade an employee from "engaging in the protected activity … judged from the perspective of a reasonable person in the plaintiff's position." *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 275 (7th Cir. 2023) (internal citations omitted). Plaintiff points to many of the issues she identified in her hostile work environment claim as adverse employment actions in her retaliation claim. *See* [66] at 14–15. Anything that occurred before March 2018, when Jarolin-Bogert told Whitehead and Brodner that she felt that males were treated better than females, is not relevant to the analysis because it could not be caused by Jarolin-Bogert's statement. That leaves denials of vacation time for December 2018 and 2019, discipline for not signing the agreement to not use her vacation time in December 2018, receipt of "satisfactory" performance evaluations for 2018 and 2019, and being re-assigned work after returning from leave. Much of this did not actually dissuade Jarolin-Bogert from engaging in statutorily protected activity because she filed EEOC charges in August 2018 and June 2019. However, it is an objective standard, so I ask whether a reasonable person would be dissuaded from engaging in statutorily protected activity.

The "satisfactory" ratings would not dissuade a reasonable person from engaging in protected activity because "satisfactory" is not a negative review nor did it represent an extraordinary change in Jarolin-Bogert's employment conditions. The

reviews themselves reflect both appreciation of Jarolin-Bogert's strengths and criticism of her weaknesses. *See* [50-5] at 3; [50-6] at 3. Jarolin-Bogert had previously received a "satisfactory" rating in 2016, so the 2018 and 2019 ratings were not a sudden departure from the norm. A reasonable person in her shoes would not be dissuaded from engaging in protected activity because of the ratings, so they are not adverse employment actions for purposes of Jarolin-Bogert's retaliation claim.

A reasonable person might be affected by the denials of vacation time, discipline, and the change of job duties, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70–71 (retaliatory work assignments is classic example of retaliation), but there is no evidence in the record that any of those actions were taken *because of* Jarolin-Bogert's protected activity. To show proof of causation, Jarolin-Bogert must "offer evidence that a retaliatory motive was a but-for cause of the challenged employment action … This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Lesiv v. Ill. Cent. R. R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) (internal citations omitted).

There is no evidence in the record to support a finding that Jarolin-Bogert's vacation requests for December 2018 and December 2019 were denied because of her protected activity. "In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity." *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021). The department

director who changed Jarolin-Bogert's time from paid to unpaid in December 2018 did not know of Jarolin-Bogert's EEOC charge (and there is no evidence she heard Jarolin-Bogert's comment about men being treated better than women). [63] ¶ 65. Brodner denied Jarolin-Bogert's vacation requests in July 2018, January 2019, and August 2019, [63] ¶¶ 32, 38–39, but Brodner did not know of Jarolin-Bogert's EEOC charges until October 2021. [63] ¶ 63. Because the decisionmakers did not know of the EEOC charges at the times they denied Jarolin-Bogert's vacation requests, the charges could not have been the but-for cause of the denials.

Jarolin-Bogert relies on two pieces of evidence to support her assertion that the denials of her vacation time were in retaliation for her comment that men were treated better than women. First, she was told she could not take time off during Christmas 2018 shortly after she told Brodner and Whitehead that men in the department were treated better than women. *See* [66] at 15. But "mere temporal proximity between [the protected activity] and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Brodner denied Jarolin-Bogert's July 2018 request sometime in October 2018, *see* [83] ¶ 23, so there was a seven-month gap between the protected activity and the denial. Seven months is too long, standing alone, to support an inference that Jarolin-Bogert's comment was the cause of the denial. *See Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 608 (7th Cir. 2022) (one month gap is insufficient evidence of causation).

Jarolin-Bogert also points to the fact that Brodner deviated from her standard practice when she told Perrotte to put in his vacation request more than six months before the requested time. *See* [66] at 15. While it is true that a deviation from standard practice can be circumstantial evidence of a prohibited motive, generally how the employer treated the plaintiff, not a third person, is most relevant. *See, for example, Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427–28 (7th Cir. 1992) (employer's deviation from standard procedure to help struggling employee before terminating him is evidence of pretext and retaliatory intent). Furthermore, Jarolin-Bogert does not explain why Brodner letting Perrotte request and take vacation more than six months in advance is evidence that Brodner was motivated to deny Jarolin-Bogert's vacation requests *because* Jarolin-Bogert complained that Perrotte (and other men) were treated better than women in the department. *See Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012) (deviation from standard policy less probative of intent when it is only tangentially related to adverse employment action). The deviation from standard policy does not shed any further light on what motivated Brodner to deny Jarolin-Bogert's vacation requests in July 2018 and 2019, and that is the crucial issue.[22] Jarolin-Bogert has not submitted any evidence on which a jury

---

[22] Jarolin-Bogert also argues that Whitehead was the decisionmaker for "the retaliatory actions" but the statements of fact to which she cites do not support that assertion. *See* [66] at 15 (citing [83] ¶ 17, [63] ¶ 64). It may be that Jarolin-Bogert is referring to her assertion that Whitehead was the decisionmaker for the March 2018 denial of her vacation request, [83] ¶ 13, but the March 2018 denial happened *before* Jarolin-Bogert's statement to Brodner and Whitehead. *See* [50-2] at 64:15–65:7 ("I said to Alyson and I said to Vanessa in March when I was denied because I started seeing … the handwriting on the wall … I said to Vanessa on the phone, 'I'm getting really tired of the males in this department being treated differently than myself—than the females.' And I said the same to Alyson."). Jarolin-Bogert

could rely to find that her vacation requests were denied because of Jarolin-Bogert's comments that men were treated better than women.

Jarolin-Bogert was disciplined for not signing the agreement sent to her by Whitehead which provided that if she did not take vacation time in December 2018, she would be given time off in March 2018. [83] ¶¶ 19, 21. Jarolin-Bogert provides no evidence that this discipline would not have happened but for her remark to Whitehead and Brodner that she felt males were treated better than females. There is no evidence in the record that the discipline was for a reason other than Jarolin-Bogert taking the time off in March and not signing the agreement. Jarolin-Bogert argues that she was investigated and disciplined "shortly after" she made her complaints, but "suspicious timing alone is not enough to establish a causal connection between the adverse action and the protected activity." *Abebe*, 35 F.4th at 608. This is especially true when there is an intervening event between the protected activity and the adverse action. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022). Here that intervening event is that Jarolin-Bogert took the time off in March but did not sign the agreement upon which her employer had conditioned taking such time.

As for the change of job duties, the only evidence of causation is that it occurred after Jarolin-Bogert made her EEOC charges. The last EEOC charge was in June 2019 and Jarolin-Bogert returned from her leave in early 2021; a gap of a year-and-

_____

points to no other evidence in the record that Whitehead was the decisionmaker for one of the vacation denials that occurred *after* Jarolin-Bogert's protected activity, so her knowledge of Jarolin-Bogert's protected activity isn't relevant.

a-half is too long to support a reasonable inference of causation at summary judgment. *See Lesiv*, 39 F.4th at 921 (gap of two and half years or one year is insufficient to defeat summary judgment on retaliation claim). Jarolin-Bogert has not provided any evidence on which a reasonable jury could rely to find that her job duties were reassigned because she engaged in protected activity.

## IV.    Conclusion

Defendant's motion for summary judgment, [48], is granted. Enter judgment in favor of defendants and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  September 13, 2023